PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 15-1591**

───────────

NANCY LUND; LIESA MONTAG-SIEGEL; ROBERT VOELKER,

Plaintiffs - Appellees,

v.

ROWAN COUNTY, NORTH CAROLINA,

Defendant - Appellant.

---------------------------

STATE OF WEST VIRGINIA; STATE OF ALABAMA; STATE OF ARIZONA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF INDIANA; STATE OF MICHIGAN; STATE OF NEBRASKA; STATE OF NEVADA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; MEMBERS OF CONGRESS,

Amici Supporting Appellant,

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; AMERICAN HUMANIST ASSOCIATION; ANTI-DEFAMATION LEAGUE; CENTER FOR INQUIRY; FREEDOM FROM RELIGION FOUNDATION; INTERFAITH ALLIANCE FOUNDATION; SIKH COALITION; UNION FOR REFORM JUDAISM; WOMEN OF REFORM JUDAISM,

Amici Supporting Appellees.

───────────

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. James A. Beaty, Jr., Senior District Judge. (1:13-cv-00207-JAB-JLW)

───────────

Argued: January 27, 2016          Decided: September 19, 2016

Amended: September 21, 2016

Before WILKINSON, SHEDD, and AGEE, Circuit Judges.

Reversed and remanded with directions by published opinion. Judge Agee wrote the majority opinion, in which Judge Shedd concurs. Judge Wilkinson wrote a dissenting opinion.

**ARGUED:** Allyson Newton Ho, MORGAN, LEWIS & BOCKIUS LLP, Dallas, Texas, for Appellant. Christopher Anderson Brook, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, Raleigh, North Carolina, for Appellees. **ON BRIEF:** David C. Gibbs, III, THE NATIONAL CENTER FOR LIFE AND LIBERTY, Flower Mound, Texas; John C. Sullivan, MORGAN, LEWIS & BOCKIUS LLP, Dallas, Texas; David A. Cortman, Brett B. Harvey, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona; Hiram S. Sasser, III, LIBERTY INSTITUTE, Plano, Texas, for Appellant. Daniel Mach, Heather L. Weaver, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Washington, D.C., for Appellees. Patrick Morrisey, Attorney General, Elbert Lin, Solicitor General, Julie Marie Blake, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia; Luther Strange, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama; Mark Brnovich, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona; Leslie Rutledge, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas; Pamela Jo Bondi, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF FLORIDA, Tallahassee, Florida, for Amicus State of Florida; Gregory F. Zoeller, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, for Amicus State of Indiana; Bill Schuette, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan; Douglas J. Peterson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska; Adam Paul Laxalt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada; Michael DeWine, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Amicus State of Ohio; E. Scott Pruitt, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma; Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina;

Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas. Sean Sandoloski, Dallas, Texas, Thomas G. Hungar, Alex Gesch, Lindsay S. See, Russell Balikian, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Amici Members of Congress. Richard B. Katskee, Gregory M. Lipper, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amici Americans United for Separation of Church and State, American Humanist Association, Anti-Defamation League, Center for Inquiry, Freedom From Religion Foundation, Interfaith Alliance Foundation, Sikh Coalition, Union for Reform Judaism, and Women of Reform Judaism.

_____

AGEE, Circuit Judge:

The Board of Commissioners of Rowan County, North Carolina, ("the Board") opens its public meetings with an invocation delivered by a member of the Board. The district court determined that practice violates the Establishment Clause of the First Amendment. Under the Supreme Court's most recent decision explaining legislative prayer, Town of Greece v. Galloway, 134 S. Ct. 1811 (2014), we find the Board's legislative prayer practice constitutional and reverse the judgment of the district court.

I.

The relevant facts are undisputed. Rowan County, North Carolina, exercises its municipal power through an elected Board of Commissioners, which typically holds public meetings twice a month. For many years prior to this proceeding, the Board has permitted each commissioner, on a rotating basis, to offer an invocation before the start of the Board's legislative agenda.[1]

At most Board meetings, the chairperson would call the meeting to order and invite the Board and audience to stand for the ceremonial opening. A designated commissioner would then

---

[1] The record does not reflect that the Board adopted a written policy regarding the invocations but it followed a relatively routine practice.

4

deliver an invocation of his or her choosing followed by the pledge of allegiance. The content of each invocation was entirely in the discretion of the respective commissioner; the Board, as a Board, had no role in prayer selection or content. The overwhelming majority of the prayers offered by the commissioners invoked the Christian faith in some form. For example, prayers frequently included references to "Jesus," "Christ," and "Lord." E.g., Supp. J.A. 36-37.[2] It was also typical for the invocation to begin with some variant of "let us pray" or "please pray with me." Id. Although not required to do so, the audience largely joined the commissioners in standing and bowing their heads during the prayer and remained standing for the pledge of allegiance.

In February 2012, the American Civil Liberties Union of North Carolina sent the Board a letter objecting to the invocations and asserting a violation of the Establishment Clause. The Board did not formally respond, but several commissioners expressed their intent to continue delivering prayers consistent with their Christian faith. For example, a then-commissioner stated, "I will continue to pray in Jesus' name. I am not perfect so I need all the help I can get, and

---

[2] This opinion omits internal marks, alterations, citations, emphasis, and footnotes from quotations unless otherwise noted.

asking for guidance for my decisions from Jesus is the best I, and Rowan County, can ever hope for." J.A. 325.

Subsequently, Rowan County residents Nancy Lund, Liesa Montag-Siegel, and Robert Voelker (collectively, "Plaintiffs") filed a complaint in the U.S. District Court for the Middle District of North Carolina "to challenge the constitutionality of [the Board's] practice of delivering sectarian prayer at meetings[.]" J.A. 10. Specifically, Plaintiffs alleged that the prayer practice unconstitutionally affiliated the Board with one particular faith and caused them to feel excluded as "outsiders." J.A. 12.

Apart from their objections to the prayers' contents, Plaintiffs further alleged that the overall atmosphere of the meetings coerced them to participate as a condition of attendance. Lund stated she felt "compelled to stand [during the invocation] so that [she] would not stand out." Supp. J.A. 2. Voelker offered a similar account, claiming he was "coerced" into participating because the commissioners and most audience members stood and bowed their heads. Supp. J.A. 9. Voelker also posited that any public opposition to the prayers could negatively affect his business before the Board.

Based on these allegations, Plaintiffs sought a declaratory judgment that the Board's prayer practice violated the Establishment Clause, along with an injunction preventing any

6

similar future prayers.  Plaintiffs also moved for a preliminary injunction based on then-controlling precedent that sectarian legislative prayer was a constitutional violation.  See Joyner v. Forsyth Cty., 653 F.3d 341, 347 (4th Cir. 2011) (explaining that our decisions "hewed to [the] approach [of] approving legislative prayer only when it is nonsectarian in both policy and practice").  Observing that "97% of the [Board's recorded] meetings[] have opened with a [commissioner] delivering a sectarian prayer that invokes the Christian faith," the district court entered a preliminary injunction barring the County from permitting such invocations.  J.A. 296.

The Supreme Court then issued its decision in Town of Greece, holding that the legislative prayer in that case, although clearly sectarian, was constitutionally valid and did not transgress the Establishment Clause.  Id. at 1820 ("An insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in [our] cases."); see also id. at 1815, 1824.  The parties filed cross-motions for summary judgment in light of Town of Greece.

In reviewing the summary judgment motions, the district court acknowledged that in Town of Greece the Supreme Court had "repudiated" and "dismantled" "the Fourth Circuit's legislative prayer doctrine [that had] developed around the core

7

understanding that the sectarian nature of legislative prayers was largely dispositive" of its constitutionality. Lund v. Rowan Cty., N.C., 103 F. Supp. 3d 712, 719, 721 (M.D.N.C. 2015). Moreover, the Plaintiffs did not raise the sectarian nature of the prayers as part of their summary judgment motion. Nonetheless, the district court struck down the Board's legislative invocation practice, concluding that "[s]everal significant differences" between Town of Greece and this case rendered that practice unconstitutional. Lund, 103 F. Supp. 3d at 724. The district court thought the fact that the commissioners delivered the prayers, instead of invited clergy, "deviates from the long-standing history and tradition of a chaplain, separate from the legislative body, delivering the prayer." Id. at 723. The district court further emphasized that the Board's practice created a "closed-universe of prayer-givers" that "inherently discriminates and disfavors religious minorities." Id. at 723.

After finding the Board's practice outside the constitutionally protected historical practice of legislative prayer, the district court went on to consider whether the Board's prayer practice otherwise "violate[d] the Establishment Clause as a coercive religious exercise." Id. at 724-25. Although the unrefuted record disclosed that individuals could leave the room or remain seated during the opening prayer, the

8

district court held the Board's conduct was nonetheless coercive because, among other things, the commissioners often invited the public to stand before the invocation. In the court's words,

> the Board's legislative prayer practice leads to prayers adhering to the faiths of five elected Commissioners. The Board maintains exclusive and complete control over the content of the prayers, and only the Commissioners deliver the prayers. In turn, the Commissioners ask everyone -- including the audience -- to stand and join in what almost always is a Christian prayer. On the whole, these details and context establish that [the Board's] prayer practice is an unconstitutionally coercive practice in violation of the Establishment Clause.

Id. at 733.

Based on this analysis, the district court granted Plaintiffs' motion for summary judgment and entered a permanent injunction barring the Board's legislative prayer practice. The Board timely appealed, and we review the district court's decision de novo. Simpson v. Chesterfield Cty. Bd. of Supervisors, 404 F.3d 276, 280 (4th Cir. 2005); see also Weinbaum v. City of Las Cruces, 541 F.3d 1017, 1029 (10th Cir. 2008) ("We review de novo a district court's findings of constitutional fact and its ultimate conclusions regarding a First Amendment challenge.").

II.

A.

Recognizing "this Nation's history has not been one of entirely sanitized separation between Church and State," the Supreme Court has acknowledged that government, in some instances, may properly commemorate religion in public life. Comm. for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 760 (1973). Pertinent here, the Court has expressly approved the practice of opening legislative sessions with prayer. See Joyner, 653 F.3d at 347 ("There is a clear line of precedent not only upholding the practice of legislative prayer, but acknowledging the ways in which it can bring together citizens of all backgrounds and encourage them to participate in the workings of their government."). In contrast to other Establishment Clause jurisprudence, legislative prayer stands on its own distinct ground owing to its historically based practice and acceptance.

While legislative prayer is generally a type of government speech, Turner v. City Council of Fredricksburg, 534 F.3d 352, 354 (4th Cir. 2008), the Supreme Court has always stressed its unique status. That status was evident in Marsh v. Chambers, 463 U.S. 783 (1983), which involved a challenge to the constitutionality of the Nebraska legislature's practice of having a paid chaplain offer a prayer to open each legislative

10

session.  Applying the three-part test from <u>Lemon v. Kurtzman</u>, 403 U.S. 602 (1971), the Eighth Circuit had concluded such invocations violated the Establishment Clause.  The Supreme Court disagreed.

Recounting the long-standing American tradition of opening legislative sessions with prayer, the Supreme Court traced its history "[f]rom colonial times through the founding of the Republic and ever since."  <u>Marsh</u>, 463 U.S. at 786.  The Court noted that "the First Congress, as one of its early items of business, adopted the policy of selecting a chaplain to open each session with prayer."  <u>Id.</u> at 787–88.  The Senate and House, in turn, appointed official chaplains in 1789.  <u>Id.</u> Ascribing great significance to these events, the Court explained they shed light on how the Founders viewed the Establishment Clause in relation to legislative prayer.  "It can hardly be thought that . . . they intended the Establishment Clause . . . to forbid what they had just declared acceptable." <u>Id.</u> at 790.  "This unique history [led the Court] to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from [the] practice of [legislative] prayer."  <u>Id.</u> at 791.

Having upheld legislative prayer in general, the <u>Marsh</u> Court next considered whether specific features of Nebraska's practice fell outside constitutional protection.  In that

11

regard, the plaintiff raised three challenges: (i) Nebraska had selected a representative of "only one denomination" for sixteen years; (ii) the chaplain was a paid state employee; and (iii) his prayers were offered "in the Judeo-Christian tradition." Id. at 792-93. The Supreme Court rejected all three claims, noting that the First Congress "did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view." Id. at 792. Moreover, there was no evidence that the chaplain's long tenure "stemmed from an impermissible motive," and thus his continuous appointment did "not in itself conflict with the Establishment Clause." Id. at 793-94. That the chaplain was paid from public funds was similarly "grounded in historic practice" and thus not prohibited. Id. at 794. As for the content of the prayers, the Court explained it was "not of concern" because "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." Id. at 794-95. "That being so," the Supreme Court concluded it would not "embark on a sensitive evaluation or to parse the content of a particular prayer." Id. at 795.

The Supreme Court later referenced its holding in Marsh during the course of ruling on the propriety of two religious holiday displays located on public property in County of

12

<u>Allegheny v. ACLU Greater Pittsburgh Chapter</u>, 492 U.S. 573, 578-79, 602 (1989).  In dicta commenting about legislative prayer practice permitted in <u>Marsh</u>, the Court noted that "[t]he legislative prayers involved in <u>Marsh</u> did not violate [the Establishment Clause] because the particular chaplain had removed all references to Christ."  <u>Id.</u> at 603.  The Court also observed that "not even the unique history of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief."  <u>Id.</u>

Whatever fleeting validity those observations may have had, the Supreme Court flatly rejected this approach in <u>Town of Greece</u>.  Clarifying its earlier holdings, the Court disavowed a requirement that legislative prayers must be neutral and reference only a generic God to comply with the Establishment Clause: "An insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with the tradition of legislative prayer outlined in [our] cases."  <u>Town of Greece</u>, 134 S. Ct. at 1820.

The Supreme Court's decision in <u>Town of Greece</u> guides review of this case, which, like other legislative prayer cases, requires a case-specific evaluation of all the facts and circumstances.  <u>See</u> <u>Lynch v. Donnelly</u>, 465 U.S. 668, 678-79 (1984) (observing that the Establishment Clause cannot

13

mechanistically be applied to draw unwavering, universal lines for the varying contexts of public life).  To guide that review we turn to a fuller examination of the Supreme Court's discussion in Town of Greece.

B.

The town of Greece opened its monthly legislative meetings with an invocation delivered by volunteer clergy.  It solicited guest chaplains by placing calls to local congregations listed in a directory.  Town of Greece, 134 S. Ct. at 1816.  Nearly all of the local churches were Christian, as were the guest clergy, and thus most invocations referenced some aspect of the Christian faith.  The town made no attempt to guide the prayer-givers in the content of the prayer.  Id.  Although the district court found the town's practice constitutional the Second Circuit disagreed and concluded that the "steady drumbeat of Christian prayer . . . tended to affiliate the town with Christianity," in violation of the Establishment Clause.  Id. at 1818.  The Supreme Court reversed.

Beginning with a summary of Marsh, the Court explained "that the Establishment Clause must be interpreted by reference to historical practices and understandings."  Id. at 1819; see also id. at 1818-19.  "Marsh stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific

14

practice is permitted." Id. at 1819. The pertinent inquiry in legislative prayer cases, therefore, is whether the practice at issue "fits within the tradition long followed in Congress and the state legislatures." Id. The Court added, "[a]ny test [we] adopt[] [for analyzing invocations] must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." Id.

Rooted thus, the Court rejected the plaintiffs' argument that legislative prayer must be generic or nonsectarian under the Establishment Clause. Observing that legislative invocations containing explicitly religious themes were accepted at the time of the first Congress and remain vibrant today, the Court concluded, "[a]n insistence on nonsectarian or ecumenical prayer as a single, fixed standard is not consistent with [our accepted] tradition of legislative prayer." Id. at 1820. On this point, the Court disavowed Allegheny's "nonsectarian" interpretation of Marsh as dictum "that was disputed when written and has been repudiated by later cases." Id. at 1821; see also id. ("Marsh nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content.").

The Court further observed that a content-based rule "would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and

15

censors of religious speech." Id. at 1822. Enforcing such a line would "involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact." Id. "Once it invites prayer into the public sphere," the Court stated, "government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." Id. at 1822-23.

Noting that legislative prayer has historically served a ceremonial function, "[t]he relevant constraint derives from its place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage." Id. at 1823. Even so, the Court cautioned there could be a circumstance where a legislative prayer practice failed to "serve[] [its] legitimate function": "If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion[.]" Id. at 1823.

Synthesizing these factors, the Court held that the prayers offered on behalf of the town, although almost exclusively Christian, did not evidence any pattern of denigration or proselytization. See id. ("Our tradition assumes that adult

16

citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith."). Though the plaintiffs pointed to at least two prayers in the record that arguably contained disparaging content, the Court concluded that the prayer practice as a whole served only to solemnize the board meetings. A few deviating prayers, the Court explained, were of no constitutional consequence. Id. at 1824.

Relatedly, the Court also determined there was no constitutional defect arising from the fact that the invited prayer-givers were predominantly Christian: "[s]o long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." Id. Continuing, the Court observed

> [t]he quest to promote a diversity of religious views would require the town to make wholly inappropriate judgments about the number of religions [it] should sponsor and the relative frequency with which it should sponsor each, a form of government entanglement with religion that is far more troublesome than the current approach.

Id.

Lastly, the Court addressed the plaintiffs' contention that the prayers unconstitutionally "coerce participation by nonadherents." Id. (Kennedy, J., plurality opinion). In jettisoning this argument, the Court acknowledged that

17

"coercion" could render legislative prayer beyond constitutional protection in some outlier circumstances. But the justices differed in their understandings of what constituted coercion. Compare id. at 1824-28 (Sec. II.B of Justice Kennedy's plurality opinion), with id. at 1837-38 (Sec. II. of Justice Thomas's concurring opinion).

Justice Kennedy, joined by Chief Justice Roberts and Justice Alito, framed the coercion inquiry as "a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." Id. at 1825 (Kennedy, J., plurality opinion). These Justices found no coercion in the town's prayer practice and relied heavily on the historical approach of Marsh. They presumed that reasonable observers are aware of the multiple traditions acknowledging God in this country, including legislative prayer, the pledge of allegiance, and presidential prayers. They concluded that, because of these traditions, citizens could appreciate the town's prayer practice without being compelled to participate. Id. Furthermore, they observed that the purpose of the prayers was to put legislators in a contemplative state of mind rather than have an effect on observers. Id. at 1826. Justice Kennedy further stated that "[o]ffense . . . does not equate to coercion." Id. "Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person

18

experiences a sense of affront from the expression of contrary religious views in a legislative forum." Id.[3]

With these principles from Town of Greece in mind, we now apply them to the facts presented here.

III.

Legislative prayer thus has a unique status relative to the First Amendment that places it in a different legal setting than other types of government conduct touching the Establishment Clause. See Marsh, 463 U.S. at 792. Town of Greece reflects that the constitutionality of legislative prayer hinges on its historical precedence, as it "has become part of the fabric of our society." 134 S. Ct. at 1819. If a prayer exercise has long been "followed in Congress and the state legislatures," Town of Greece reflects that a court must view it "as a tolerable acknowledgement of beliefs widely held among the people of this country." Id. at 1818-19. A court reviewing a challenge to legislative prayer "must acknowledge a practice

---

[3] Justices Thomas and Scalia, on the other hand, interpreted the Establishment Clause as prohibiting only "actual legal coercion," which they defined as the exercise of "government power in order to exact financial support of the church, compel religious observance, or control religious doctrine." Town of Greece, 134 S. Ct. at 1837 (Thomas J., concurring in part and concurring in the judgment). As no such evidence was present in the record, they concurred in the holding that the town's prayer practice should be upheld. Id. at 1837-38.

that was accepted by the Framers and has withstood the critical scrutiny of time and political change." Id. at 1819. "A test that would sweep away what has so long been settled would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent." Id.

A.

Following Town of Greece, both parties correctly acknowledge that sectarian legislative prayer, as a general matter, is compatible with the Establishment Clause.[4] What remains in dispute is whether the Board's practice of the elected commissioners delivering such prayers makes a substantive constitutional difference. The district court found this feature largely dispositive. See Lund, 103 F. Supp. 3d at 722. In its view, the prayer-giver's status as "a member of the legislative body" is a "crucial" and "determinative difference." Id. at 722, 724. The district court's decision has the practical effect of imposing a bright-line prohibition on lawmaker-led prayer.

In reaching its conclusion, the district court observed that the Supreme Court has never before sanctioned legislator-

---

[4] At oral argument before this Court, the Plaintiffs specifically agreed the sectarian aspect of the invocation prayers at the Board meetings was not an issue they raise. Oral Argument at 17:10-17:32 and 20:10-21:24.

20

led prayers: "[I]t is telling that throughout its Town of Greece opinion and the opinion in Marsh, the Supreme Court consistently discussed legislative prayer practices in terms of invited ministers, clergy, or volunteers providing the prayer, and not once described a situation in which the legislators themselves gave the invocation." Id. at 722. In essence, the district court treated the Supreme Court's jurisprudential silence on lawmaker-led prayer as conclusively excluding legislators from being permissible prayer-givers to their own legislative bodies. That conclusion is not supportable.

While Town of Greece involved a rotating group of local clergy and Marsh concerned a paid chaplain, the Supreme Court attached no significance to the speakers' identities in its analysis and simply confined its discussion to the facts surrounding the prayer practices before it. See Town of Greece, 134 S. Ct. at 1816; Marsh, 463 U.S. at 784-85. Nowhere did the Court say anything that could reasonably be construed as a requirement that outside or retained clergy are the only constitutionally permissible givers of legislative prayer. Quite the opposite, Town of Greece specifically directs our focus to what has been done in "Congress and the state legislatures" without any limitation regarding the officiant. Id. at 1819. We find the Supreme Court's silence on the issue of lawmaker-led prayer to be simply that: silence. See United

21

States v. Stewart, 650 F.2d 178, 180 (9th Cir. 1981) (remarking it would be improper to draw any inference from the Supreme Court's silence on an issue not placed before it).

Nor has this Court previously assigned weight to the identity of the prayer-giver. To the contrary, we have suggested this feature is irrelevant. For example, in Wynne v. Town of Great Falls, we remarked that "[p]ublic officials' brief invocations of the Almighty before engaging in public business have always, as the Marsh Court so carefully explained, been part of our Nation's heritage." 376 F.3d 292, 302 (4th Cir. 2004). Similarly, Joyner v. Forsyth County observed that "[i]t [is] the governmental setting for the delivery of sectarian prayers that courted constitutional difficulty, not those who actually gave the invocation." 653 F.3d at 350; see also id. at 351. And in Simpson v. Chesterfield County Board of Supervisors, we noted that the Supreme Court, "neither in Marsh nor in Allegheny, held that the identity of the prayer-giver, rather than the content of the prayer, was what would affiliate the government with any one specific faith or belief." 404 F.3d at 286. Although these cases ultimately turned on the now-rejected position that sectarian prayer was constitutionally invalid, none made the prayer-giver's identity dispositive.

On a broader level, and more importantly, the very "history and tradition" anchoring the Supreme Court's holding in Town of

22

_Greece_ underscores a long-standing practice not only of legislative prayer generally but of lawmaker-led prayer specifically. Opening invocations offered by elected legislators have long been accepted as a permissible form of religious observance. See S. Rep. No. 32-376, at 4 (1853) (commenting that the authors of the Establishment Clause "did not intend to prohibit a just expression of religious devotion by the legislators of the nation, even in their public character as legislators" (emphasis added)); see also _Lynch_, 465 U.S. at 674 ("There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789."). As just one example, the South Carolina Provincial Congress -- South Carolina's first independent legislature -- welcomed an elected member to deliver its opening invocations. See South Carolina Provincial Congress, Thanks to the Continental Congress (Jan. 11, 1775), http://amarch.lib.niu.edu/islandora/object/niu-amarch%3A94077 (last visited Aug. 31, 2016 and saved as ECF opinion attachment). "The recognition of religion in these early public pronouncements is important, unless we are to presume the founders of the United States were unable to understand their own handiwork." _Myers v. Loudoun Cty. Sch. Bd._, 418 F.3d 395, 404 (4th Cir. 2005).

23

This tradition of legislative prayer has continued to modern day. A majority of state and territorial assemblies honor requests from individual legislators to give an opening invocation. See National Conference of State Legislatures, Inside the Legislative Process 5-151 to -152 (2002), http:// www.ncsl.org/documents/legismgt/ILP/02Tab5Pt7.pdf (observing legislators may offer an opening prayer in at least thirty-one states). Lawmaker-led prayer is especially prevalent in the states under our jurisdiction, where seven of the ten legislative chambers utilize elected members for this purpose. See id.; Br. for State of W. Va. et al. as Amici Curiae Supporting Defendant-Appellant at 14 & Addend. 2; see also Prayers Offered in the North Carolina House of Representatives: 2011-2014, http://nchousespeaker.com/docs/opening-prayers-nchouse-2011-2014.pdf (last visited July 12, 2016). Several of these states have enacted legislation recognizing the historical practice of legislative prayer. For example, a Virginia statute protects legislators who deliver a sectarian prayer during deliberative sessions. See Va. Code § 15.2-1416.1. And South Carolina expressly authorizes its elected officials to open meetings with prayer. See S.C. Code § 6-1-160(B)(1); see also Mich. H.R. Rule 16 (requiring the clerk of the Michigan House of Representatives to arrange "for a Member to offer an invocation" at the beginning of each session).

24

Lawmaker-led prayer finds contemporary validation in the federal government as well. Both houses of Congress allow members to deliver an opening invocation. As recently as May 2015, Senator James Lankford commenced legislative business in the Senate with a prayer invoking the name of Jesus. 161 Cong. Rec. S3313 (daily ed. May 23, 2015). The congressional record is replete with similar examples. See, e.g., 159 Cong. Rec. S3915 (daily ed. June 4, 2013) (prayer by Sen. William M. Cowan); 155 Cong. Rec. S13401-01 (daily ed. Dec. 18, 2009) (prayer by Sen. John Barrasso); 119 Cong. Rec. 17,441 (1973) (statement of Rep. William H. Hudnut III); see also 2 Robert C. Byrd, The Senate 1789-1989: Addresses on the History of the United States Senate 305 (Wendy Wolff ed., 1990) ("Senators have, from time to time, delivered the prayer.").

In view of this long and varied tradition of lawmaker-led prayer, the district court's judicial wall barring elected legislators from religious invocations runs headlong into the Supreme Court's acknowledgement that "[a]ny test [we] adopt[] must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." Town of Greece, 134 S. Ct. at 1819. As Justice Alito aptly explained, "if there is any inconsistency between any [Establishment Clause] test[] and the historic practice of legislative prayer, the inconsistency calls into question the

25

validity of the test, not the historic practice." Id. at 1834 (Alito, J., concurring). Heeding this advice, we decline to accept the district court's view that legislative prayer forfeits its constitutionally protected status because a legislator delivers the invocation. A legal framework that would result in striking down legislative prayer practices that have long been accepted as "part of the fabric of our society" cannot be correct. Id. at 1819.

In reaching its decision, the district court seems to have wholly ignored a foundational principle in Town of Greece. "The principal audience for these invocations is not, indeed, the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing." Id. at 1825 (Kennedy, J., plurality opinion).

Not only are the legislators themselves the intended "congregation" for legislative prayer, but the practice carries special meaning to the thousands of state and local legislators who are citizen representatives. In this respect, the Supreme Court has specifically singled out "members of town boards and commissions, who often serve part-time and as volunteers," as lawmakers for whom "ceremonial prayer may . . . reflect the values they hold as private citizens." Id. at 1826. If legislative prayer is intended to allow lawmakers to "show who

26

and what they are" in a public forum, then it stands to reason that they should be able to lead such prayers for the intended audience: themselves. Id. Indeed, legislators are perhaps uniquely qualified to offer uplifting, heartfelt prayer on matters that concern themselves and their fellow legislators.

The district court's determination that the fact that a legislator delivers a legislative prayer is a significant constitutional distinction, at least in the context of this case, was error.

B.

We turn now to the question of whether some other facet of the Board's practice, beyond the bare fact that lawmaker-led prayer is offered, takes this case outside the protective umbrella of legislative prayer. Although the Supreme Court has not forged a comprehensive template for all acceptable legislative prayer, its decisions set out guideposts for analyzing whether a particular practice goes beyond constitutional bounds. See Snyder, 159 F.3d at 1233 ("Marsh implicitly acknowledges some constitutional limits on the scope and selection of legislative prayers[.]").

1.

An initial guidepost relates to the selection of the content of legislative prayer. In rejecting the plaintiffs' position that invocations must be nonsectarian, the Supreme

27

Court in Town of Greece explained that such a rule "would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech." 134 S. Ct. at 1822. Such an outcome, the Court continued, "would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact." Id.

The district court determined the Board's practice was invalid under this standard because the individual commissioners author their own invocations, and by doing so act as "supervisors of the prayers." Lund, 103 F. Supp. 3d at 723. It reasoned that "the government is [thus improperly] delivering prayers that were exclusively prepared and controlled by the government[.]" Id. We disagree. The Board's practice here, where each commissioner gives their own prayer without oversight, input, or direction by the Board simply does not present the same concerns of the "government [attempting] to define permissible categories of religious speech." Town of Greece, 134 S. Ct. at 1822 (emphasis added).

What the Supreme Court has cautioned against in this context is "for[cing] the legislatures that sponsor prayers . . . . to act as . . . . supervisors and censors of religious speech." Id. (emphasis added). To be sure, in offering the invocations

28

the individual commissioners sometimes convey their personal alignment with a particular faith. But the Court has always looked to the activities of the legislature as a whole in considering legislative prayer. This makes perfect sense; for it is only through act of the deliberative body writing or editing religious speech that government would impermissibly seek "to promote a preferred system of belief or code of moral behavior" with selected content. Town of Greece, 134 S. Ct. at 1822. There is no evidence that the Board, as a Board, had any role in any of the prayers by the individual commissioners. The record is devoid of any suggestion that any prayer in this case is anything but a personal creation of each commissioner acting in accord with his or her own personal views.

In effect, each commissioner is a free agent like the ministers in Town of Greece and the chaplain in Marsh who gave invocations of their own choosing. In other Establishment Clause contexts, the Supreme Court has stressed this element of private choice, holding that when a neutral government policy or program merely allows or enables private religious acts, those acts do not necessarily bear the state's imprimatur. See Zelman v. Simmons-Harris, 536 U.S. 639, 652 (2002) (school voucher programs); Mueller v. Allen, 463 U.S. 388, 399 (1983) (school-related income tax deductions). As the Supreme Court stated in Town of Greece, "[o]nce it invites prayer into the public

29

sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." 134 S. Ct. at 1822-23.

The Board's legislative prayer practice amounts to nothing more than an individual commissioner leading a prayer of his or her own choosing.

2.

A second guidepost to acceptable legislative prayer discussed in Town of Greece concerns its content. After reaffirming the holding in Marsh that lower courts should refrain from becoming embroiled in the review of the substance of legislative prayer, the Supreme Court noted that there could be certain circumstances where sectarian references cause a legislative prayer practice to fall outside constitutional protection. Id. at 1823. "If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion," a constitutional line can be crossed. Id. In that circumstance, the Court observed, "many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort." Id.

To this end, courts need only assure themselves that sectarian legislative prayer, viewed from a cumulative

30

perspective, is not being exploited to proselytize or disparage. Below this threshold, the Supreme Court has disclaimed any interest in the content of legislative invocations, announcing a strong disinclination "to embark on a sensitive evaluation or to parse the content of a particular prayer." Marsh, 463 U.S. at 795.

The record in this case reflects that the Board's prayer practice did not stray across this constitutional line of proselytization or disparagement. See Wynne, 376 F.3d at 300 ("To 'proselytize' on behalf of a particular religious belief necessarily means to seek to 'convert' others to that belief[.]"). The content of the commissioners' prayers largely encompassed universal themes, such as giving thanks and requesting divine guidance in deliberations. References to exclusively Christian concepts typically consisted of the closing line, such as "In Jesus' name. Amen." See Supp. J.A. 29-31. There is no prayer in the record asking those who may hear it to convert to the prayer-giver's faith or belittling those who believe differently.[5] And even if there were, it is

---

[5] The four prayers that the dissent cites as constitutionally offensive bear in common the fact that none attempt to convert any hearer to change their faith; none belittle those of another faith; and none portend that a person of another faith would be treated any differently by the prayer-giver in the business of the Board. In short, none of those
(Continued)

31

the practice as a whole -- not a few isolated incidents -- which controls. <u>Town of Greece</u>, 134 S. Ct. at 1824 ("Absent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation.").

The invocation delivered at the Board's October 17, 2011, meeting is illustrative of what the Board members and the public in Rowan County would hear:

> Let us pray.  Father we do thank you for the privilege of being here tonight.  We thank you for the beautiful day you've given us, for health and strength, for all the things we take for granted.  Lord, as we read the paper today, the economic times are not good, and many people are suffering and doing without.  We pray for them; we pray that you would help us to help.  We pray for the decisions that we will make tonight, that God, they will honor and glorify you. We pray that you would give us wisdom and understanding.  We'll thank you for it.  In Jesus' name.  Amen.

Supp. J.A. 31.  Such prayer comes nowhere near the realm of prayer that is out of bounds under the standards announced in <u>Town of Greece</u>.  Prayers that chastise dissenters or attempt to sway nonbelievers press the limits of the Supreme Court's instruction and may not merit constitutional protection, but no

---

cited prayers bears any of the hallmarks of constitutional question set out in <u>Town of Greece</u>.

32

such prayers have been proffered in this case. See, e.g., Snyder, 159 F.3d at 1235 (finding the plaintiff's proffered prayers unconstitutional because they "strongly disparage[d] other religious views" and "s[ought] to convert his audience").

Plaintiffs call our attention to a few examples that contain more forceful references to Christianity out of the hundreds of legislative prayers delivered before Board meetings. As an initial matter, the sectarian content cited in Plaintiffs' opening brief (and referenced by the dissent) is austere and innocuous when measured against invocations upheld in Marsh. See 463 U.S. at 823 n.2 (Stevens, J., dissenting) (quoting an exemplar challenged prayer). Regardless, Plaintiffs' hypersensitive focus is misguided. Town of Greece "requires an inquiry into the prayer opportunity as a whole, rather than into the contents of a single prayer." 134 S. Ct. at 1824. "Absent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation." Id. Given the respectful tone of nearly all the invocations delivered here, which largely mirror those identified in Town of Greece, the Board's practice crossed no constitutional line. See id. at 1824 (holding that a few stray remarks are insufficient to "despoil a practice that on the whole reflects and embraces our tradition").

33

Moving beyond the invocations themselves, a third guidepost to legislative prayer relates to the selection of the prayer-giver. In Town of Greece, the challenged practice resulted in "a predominately Christian set of ministers . . . lead[ing] the prayer." Id. The Court found this fact unremarkable because "[t]he town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one." Id. "So long as the town maintains a policy of nondiscrimination," then "the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." Id.

The district court found the Board's legislative prayer practice objectionable because the invocation opportunity was rotated among only the elected commissioners; that is, all of the Board members. According to the district court, "[w]hen all faiths but those of the five elected Commissioners are excluded, the policy inherently discriminates and disfavors religious minorities." Lund, 103 F. Supp. 3d at 723. Marsh and Town of Greece reflect that the district court's conclusion was mistaken.

The Supreme Court's prohibition on discrimination in this context is aimed at barring government practices that result

from a deliberate choice to favor one religious view to the exclusion of others. As explained in Town of Greece, concerns arise only if there is evidence of "an aversion or bias on the part of town leaders against minority faiths" in choosing the prayer-giver. 134 S. Ct. at 1824. The Marsh Court likewise alluded to this requirement when it cautioned that the selection of a guest chaplain cannot stem from "an impermissible motive." 463 U.S. at 793. Read in context, this condition appears directed at the conscious selection of the prayer-giver on account of religious affiliation. See id. at 793.

The district court's opinion aims elsewhere, essentially mandating prayer-giver diversity. See Lund, 103 F. Supp. 3d at 723 ("[T]he present case presents a closed-universe of prayer-givers, . . . [leaving] minority faiths [with] no means of being recognized."). For example, under the district court's framework, a legislature, including Congress, would be prohibited from permitting individual members to deliver the opening invocation to solemnize its proceedings unless an unlimited number of faiths were actually represented by the elected representatives. But diversity among the beliefs represented in a legislature has never been the measure of legislative prayer. Town of Greece specifically rejected the notion that lawmaking bodies must "promote a diversity of religious views." 134 S. Ct. at 1824. Consequently, the town

35

was not obliged to "search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." Id. And in Marsh, the Nebraska legislature appointed the same Presbyterian minister for sixteen years to the exclusion of all other creeds. The Court was unpersuaded that this made a constitutional difference. See Marsh, 463 U.S. at 793.

Thus, while the Board's practice limits the represented faiths to those of the individual commissioners, that is no different from the limitations built into the constitutional prayer practices in Town of Greece and Marsh. See Simpson, 404 F.3d at 285 ("A party challenging a legislative invocation practice cannot . . . rely on the mere fact that the selecting authority chose a representative of a particular faith, because some adherent or representative of some faith will invariably give the invocation."). There is simply no requirement in our case law that a legislative prayer practice reflect multiple faiths or even more than one to be constitutionally valid.

Absent proof the Board restricted the prayer opportunity among the commissioners as part of an effort to promote only Christianity, we must view its decision to rely on lawmaker-led prayer as constitutionally insignificant. See Pelphrey v. Cobb Cty., 547 F.3d 1263, 1281 (11th Cir. 2008) ("[Marsh] does not require that all faiths be allowed the opportunity to pray. The standard instead prohibits purposeful discrimination.").

36

Plaintiffs have not directed the Court to any evidence that would suggest the Board harbored such a motive. It is uncontested that the Board's policy was facially neutral and bereft of government discretion. A person of any creed can be elected to the Board and is entitled to speak without censorship. Furthermore, as far as we can tell, the Board never altered its practice to limit a non-Christian commissioner or attempted to silence prayers of any viewpoint. See Lund, 103 F. Supp. 3d at 714-16.

The Supreme Court has determined that the selection of a prayer-giver who represents a single religious sect, even over many years, does not advance any one faith or belief over another. See Marsh, 463 U.S. at 793 ("We cannot, any more than Members of the Congresses of this century, perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church."); Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk, 758 F.3d 869, 874 (7th Cir. 2014) ("Marsh and Greece show that a government may, consistent with the First Amendment, open legislative sessions with Christian prayers while not inviting leaders of other religions[.]"). A party challenging a legislative prayer practice cannot rely on the mere fact that the selecting authority has confined the invocation speakers to a narrow group. This is particularly true here as the Board has no voice

37

in the selection of commissioners, which is entirely up to the citizens by election.

4.

A final guidepost to legislative prayer is found in the statement from Town of Greece that the prayer practice "over time" may not be "exploited to . . . advance any one . . . faith or belief." 134 S. Ct. at 1823. We must discern, then, whether over time the Board's practice conveys the view that Rowan County "advance[d]" Christianity over other creeds. Id.

The Board has not picked any of the prayers under its legislative prayer practice of ceremonial invocation by which the commissioners' prayers solemnize their meeting. Town of Greece fully supports this approach, reaffirming the principle first set out in Marsh that a governmental subdivision does not endorse any one faith or belief by opening its forum to prayers, even sectarian ones. See McCreary Cty. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 859 n.10 (2005) (citing Marsh as an example of a permissible governmental action whose "manifest purpose was presumably religious"). And this remains true even when sectarian religious content is communicated regularly. See Galloway v. Town of Greece, 681 F.3d 20, 24-25 (2d Cir. 2012) (observing that "[r]oughly two-thirds" of the prayers at issue in that case "contained uniquely Christian language," while

38

"[t]he remaining third of the prayers spoke in more generically theistic terms").

The prayers in this case, like those in <u>Town of Greece</u>, were largely generic petitions to bless the commissioners before turning to public business. References to Christian concepts typically consisted of the closing statement "in Jesus' name we pray," or a similar variation. Supp. J.A. 31. As <u>Town of Greece</u> imparts, such prayers do not unconstitutionally convey the appearance of an official preference for Christianity. Rather, "[o]ur tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate [sectarian] ceremonial prayer[.]" <u>Town of Greece</u>, 134 S. Ct. at 1823.

Had a chaplain offered prayers identical to those in the instant case, <u>Town of Greece</u> and <u>Marsh</u> would unquestionably apply to uphold the Board's practice. Unlike the district court, we are unconvinced the feature of a legislator delivering the prayer to fellow legislators signals an unconstitutional endorsement of religion.

Practically speaking, the public seems unlikely to draw a meaningful distinction between a state-paid chaplain and the legislative body that appoints him. "Such chaplains speak for the legislature." <u>Snyder</u>, 159 F.3d at 1238 (Lucero, J., concurring in judgment). They are in essence "deputized" to

39

represent the governing body in this context. Cf. Town of Greece, 134 S. Ct. at 1850 (Kagan, J, dissenting). Consequently, when an elected representative underscores his alignment with a particular faith during the invocation, as is sometimes the case here, the risk of placing the government's weight behind this view is the same as those practices upheld in Marsh and Town of Greece. In other words, the degree of denominational preference projected onto the government with lawmaker-led prayer is not significantly different from selecting denominational clergy to do the same. Both prayers arise in the same context and serve the same purpose.

If anything, allowing the legislative body to collectively select a tenured chaplain as in Marsh would seem to pose a greater problem. The presence of a single religious figure, particularly a paid state employee, seems more likely to reflect a perceived governmental endorsement of the faith that individual represents. Yet, the Supreme Court has concluded this more obvious preference is not constitutionally significant. See Rubin v. Lancaster, 710 F.3d 1087, 1097 (9th Cir. 2013) ("[W]hatever message Nebraska might have conveyed through its practice of selecting, paying, and retaining for sixteen years a Presbyterian chaplain who often delivered explicitly Christian invocations, the Supreme Court concluded that the legislature had not advanced Christianity.").

Legislative prayer is constitutionally acceptable when it "fits within the tradition long followed in Congress and the state legislatures." Town of Greece, 134 S. Ct. at 1819. The Supreme Court has observed that prayers offered within this tradition have a common theme and "respectful" tone -- they are given "at the opening of legislative sessions, where it is meant to lend gravity to the occasion." Id. at 1823. Acceptable legislative prayer thus "solemnize[s] the occasion" and "invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing[.]" Id. The record here reflects just such prayers.

C.

We now turn to Plaintiffs' claims that the Board's legislative prayer practice is impermissibly coercive. The "coercion test" under the Establishment Clause reflects that the government violates the Constitution if it compels religious participation. See Allegheny, 492 U.S. at 660 (Kennedy, J., concurring in judgment in part and dissenting in part). Although spurned by the Supreme Court for some time, see Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 223 (1963) (noting that Free Exercise cases were "predicated on coercion while [an] Establishment Clause violation need not be"), the coercion test gradually emerged as part of Establishment Clause doctrine in several decisions regarding school-sponsored prayer.

41

See Lee v. Weisman, 505 U.S. 577, 593 (1992) (striking down clergy-led prayers at graduation ceremonies because the school district's "supervision and control . . . places public pressure, as well as peer pressure, on attending students . . . as real as any overt compulsion."); Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 310-17 (2000) (finding prayers at high school football games unconstitutionally coercive).

Although previously unclear whether the coercion test applied beyond the schoolhouse, see G. Sidney Buchanan, Prayer in Governmental Institutions: The Who, the What, and the At Which Level, 74 Temp. L. Rev. 299, 339-42 (2001); see also Mellen v. Bunting, 327 F.3d 355, 366-72 (4th Cir. 2003) (recognizing a gap in Supreme Court precedent with regard to secular expression not directed to children), Town of Greece settled that ambiguity by observing that a coercion-based analysis applies to adults encountering religious observances in governmental settings. See 134 S. Ct. at 1825 (Kennedy, J., plurality opinion) ("It is an elemental First Amendment principle that government may not coerce its citizens to support or participate in any religion or its exercise.").

The Town of Greece majority, however, was unable to settle on what constitutes coercion in the legislative prayer context. Although five Justices agreed that the town did not engage in an unconstitutional coercion, they reached this conclusion by

separate paths. Justices Thomas and Scalia would require coercion to consist of "the coercive state establishments that existed at the founding," which essentially equates to religious observance "by force of law and threat of penalty." Town of Greece, 134 S. Ct. at 1837 (Thomas J., concurring in part and concurring in the judgment). Justice Kennedy, joined by Chief Justice Roberts and Justice Alito, framed the inquiry as "a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." Id. at 1825 (Kennedy, J., plurality opinion). Under this view, "[c]ourts remain free to review the pattern of prayers over time to determine whether they comport with the tradition of solemn, respectful prayer approved in Marsh, or whether coercion is a real and substantial likelihood." Id. at 1826-27. The history and tradition of legislative prayer is relevant here, too, and the "reasonable observer" is presumed to be aware of that history and recognize the purpose of such practices. Id. at 1825.

The district court divided its coercion analysis into two parts. First, it considered the issue under Town of Greece, concluding "Justice Kennedy's general rules for evaluating potential coercion in the legislative prayer context . . . point the [c]ourt in the direction of finding the practice of [the Board] unconstitutionally coercive." Lund, 130 F. Supp. 3d at

43

729.  The district court then "turn[ed] to the principles of [the] coercion doctrine developed prior to the Town of Greece decision," finding these cases likewise suggested the Board violated the Establishment Clause.  Id.

As noted above, the Supreme Court's coercion doctrine prior to Town of Greece developed in several cases involving public school events with children.  The potential for undue influence, however, is less significant when dealing with prayer involving adults, and this distinction warrants a difference in constitutional analysis.  The law recognizes a meaningful distinction between children in a school setting and a legislative session where adults are the participants.  See Stein v. Plainwell Cmty. Schs., 822 F.2d 1406, 1409 (6th Cir. 1987) ("The potential for coercion in the prayer opportunity was one of the distinctions employed by the Court in Marsh to separate legislative prayer from classroom prayer.").  The Supreme Court assumes that adults are "not readily susceptible to religious indoctrination or peer pressure."  Marsh, 463 U.S. at 792; see also Town of Greece, 134 S. Ct. at 1823 ("[A]dult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith.").

Consistent with this distinction, we do not find the Supreme Court's prior coercion cases applicable in analyzing

44

legislative prayer like that at issue here. See Simpson, 404 F.3d at 281 ("Marsh, in short, has made legislative prayer a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines."). Thus, we look to the coercion analysis in Town of Greece, recognizing first that the Board clearly did not engage in coercion under the view expressed by Justices Scalia and Thomas. But we analyze the issue under the view more favorable to the Plaintiffs as expressed in Justice Kennedy's plurality opinion. Under that approach, the Court must conduct a fact-sensitive inquiry "consider[ing] both the setting in which the prayer arises and the audience to whom it is directed." Town of Greece, 134 S. Ct. at 1825 (Kennedy, J., plurality opinion).

In upholding the invocation practice in Town of Greece, the Supreme Court plurality identified several "red flags" that could signal when a prayer exercise is coercive and thus not within the historical tradition of constitutionally protected legislative prayer. See id. at 1825-27. Specifically, the Court explained that coercion may exist "if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." Id. at 1826. The Court also identified as problematic "practice[s] that classified citizens based on their

45

religious views" or resulted in a pattern of prayers used to "intimidate" or "chastise[] dissenters." Id.

It is not difficult to understand why the Court placed the coercion bar so high in this context. As noted, adults are not presumed susceptible to religious indoctrination or pressure simply from speech they would rather not hear. Thus, there is limited risk that disenchanted listeners would be affected by mere contact with lawmaker-led legislative prayer. "Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views[.]" Id.; see also Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 44 (2004) (O'Connor, J., concurring in the judgment) ("[T]he Constitution does not guarantee citizens a right entirely to avoid ideas with which they disagree.").

The district court erred in concluding the Board's prayer practice was coercive under this framework. The commissioners' prayers "neither chastised dissenters nor attempted lengthy disquisition on religious dogma." Town of Greece, 134 S. Ct. at 1826 (Kennedy, J., plurality opinion). Rather, as illustrated previously, the content largely followed the spirit of solemn, respectful prayer approved in Marsh and Town of Greece. Moreover, the record shows that both attendance and participation in the invocations were voluntary. The Board has

46

represented without contradiction that members of the public were free to remain seated or otherwise "disregard the Invocation in a manner that [was] not disruptive." J.A. 277. Thus, as a practical matter, citizens attending a Board meeting who found the prayer unwanted had several options available -- they could arrive after the invocation, leave for the duration of the prayer, or remain for the prayer without participating: just like the audiences in Marsh and Town of Greece. And to the extent individuals like Plaintiffs elected to stay, "their quiet acquiescence [would] not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed." Town of Greece, 134 S. Ct. at 1827 (Kennedy, J., plurality opinion).

The record is similarly devoid of evidence that anyone who chose not to participate during the prayer suffered adverse consequences, that their absence was perceived as disrespectful, or was recognized by the Board in any way. To the contrary, the Board has attested that such conduct would have "no impact on [the constituent's] right to fully participate in the public meeting, including addressing the commission and participating in the agenda items in the same matter as permitted any citizen of Rowan County." J.A. 277. Plaintiffs point us to no evidence to the contrary. Thus, it is implausible on this record to suggest that Plaintiffs were "in a fair and real sense" coerced

47

to participate in the Board's exercise of legislative prayer. Lee, 505 U.S. at 586.

Plaintiffs' allegations that the prayer practice made them feel subjectively "excluded at meetings" and that the Board's "disagreement with [their] public opposition to sectarian prayer could make [them] less effective advocate[s]" does nothing to change the outcome. Lund, 130 F. Supp. 3d at 715-16. Town of Greece explicitly rejected the claim that a citizen's perceived "subtle pressure to participate in prayers that violate their beliefs in order to please the board members from whom they are about to seek a favorable ruling" constitutes coercion. 134 S. Ct. at 1825 (Kennedy, J., plurality opinion). This is true even where the legislative body may "know many of their constituents by name," making anonymity less likely for those citizens who decline to rise or otherwise participate in the invocation. Id. Likewise, merely exposing constituents to prayer they find offensive is not enough. "[I]n the general course[,] legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate." Id. at 1827.

To be sure, legislative prayer may stray across the constitutional line if "town leaders allocate[] benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the

48

invocation or quietly declined." Id. at 1826. But there must be evidence in the record to support allegations of that sort. There is no such evidence in this case.

Plaintiffs make several arguments in support of the district court's coercion ruling. They first claim that the prayer practice here was "an external act focused on the broader public," which "has a type of coercive power that the internally directed [prayers] in Town of Greece [did] not." Response Br. 8, 11. Plaintiffs point to several invocations where the commissioners offered prayers on behalf of others as well as themselves. This evidence, in Plaintiffs' view, shows that the commissioners did "not consider the prayer practice an internal act directed at one another, but rather, that it is also directed toward citizens and for the benefit of all." Id. at 11.

Town of Greece notes the internal or external nature of a prayer practice in determining whether impermissible coercion occurred. See 134 S. Ct. at 1825 (Kennedy, J., plurality opinion) ("The principal audience for these invocations is not, indeed, the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing."). The Supreme Court's rationale here is obvious. The probability of coercion can be heightened should the prayers be directed at those in

attendance.  Plaintiffs' argument, however, posits that any prayer referencing a person or concern beyond the members of the legislative body is externally directed and thus prohibited. That cannot be.  Legislative prayer does not lose its constitutionally protected status because it includes a request for divine protection for persons other than those serving in office, such as our troops overseas or first responders.  The Supreme Court has never required such a single-minded purpose. Indeed, the prayers in Town of Greece contained similar expressions focused at persons other than fellow legislators. See id. at 1824.  The fact that individual commissioners here sometimes prayed that God bless, protect, and heal wounded soldiers in Iraq and injured police officers does not take the prayers outside the realm of constitutionally protected legislative prayer.[6]

Plaintiffs next argue that the commissioners unacceptably directed public participation in the prayers.  To reiterate, the Board's opening ceremony usually began with the chairperson asking everyone to stand "for the Invocation and Pledge of

---

[6] Taking two of the exemplar prayers referenced by the dissent, we do not understand the connection to coercion if the gallery audience heard the Commissioner delivering the prayer ask God to "continue to bless everyone in this room, our families, our friends, and our homes" or to "forgive our pride and arrogance, heal our souls, and renew our vision." Cf. infra 70 (citing J.A. 16, 17).

50

Allegiance." Lund, 103 F. Supp. 3d at 714. The designated commissioner would then offer an invocation that typically started with "let us pray" or "please pray with me." Id. Plaintiffs maintain that these statements amount to unconstitutional coercion. The district court agreed, concluding the commissioners' statements "fall squarely within the realm of soliciting, asking, requesting, or directing, and thus within the territory of concern [in] Town of Greece." Id. at 728.

Again, we disagree. Similar invitations have been routinely offered for over two centuries in the U.S. Congress, the state legislatures, and countless local boards and councils. No case has ever held such a routine courtesy opening a legislative session amounts to coercion of the gallery audience. It would come as quite a shock to the Founders if it had.

When the Supreme Court in Town of Greece expressed concern about prayer-givers "direct[ing] the public to participate in the prayers," it did not have the foregoing in mind. 134 S. Ct. at 1826 (Kennedy, J., plurality opinion). Coercion is measured "against the backdrop of historical practice." Id. at 1825. "As a practice that has long endured, legislative prayer has become part of our heritage and tradition . . . similar to the Pledge of Allegiance [or] inaugural prayer[.]" Id. "It is presumed that the reasonable observer is acquainted with this

51

tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens[.]" Id. Viewed through this lens, no reasonable person would interpret the commissioners' commonplace invitations as government directives commanding participation in the prayer. The phrase "let us pray" is a familiar and "almost reflexive" call to open an invocation that hardly compels in the rational mind thoughts of submission. Id. at 1832 (Alito, J., concurring). The same goes for the Board's request for audience members to stand. We may safely assume that mature adults, like Plaintiffs, can follow such contextual cues without the risk of religious indoctrination. See Marsh, 463 U.S. at 792. Telling here is Plaintiffs' own evidence, which indicates that some portion of the audience often chose not to participate. See J.A. 12 (noting only "most" of the audience stood). In sum, opening a legislative prayer with a short invitation to rise and join hardly amounts to "orchestrat[ing] the performance of a formal religious exercise in a fashion that practically obliges the involvement of non-participants." Myers, 418 F.3d at 406.

Lastly, Plaintiffs claim they were singled out for opprobrium by "Board members signaling their disfavor of those who did not fall in line." Response Br. 20. Plaintiffs cite to several public statements where acting commissioners were

52

critical of those in the religious minority.  See, e.g., Lund, 103 F. Supp. 3d at 715. (then-chairman Jim Sides: "I am sick and tired of being told by the minority what's best for the majority.  My friends, we've come a long way -- the wrong way. We call evil good and good evil.").  Even giving these comments the weight Plaintiffs would like, which is itself doubtful because most came post-litigation and in response to other issues having nothing to do with legislative prayer, they are insufficient to carry the day.   Such isolated incidents do not come close to showing, as Town of Greece requires, "a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose."   134 S. Ct. at 1824. Indeed, the comments cited here are not materially different from those referenced in Town of Greece, where several invocations referred to prayer opponents as the "minority" and "ignorant."  Id.  A few stray remarks are simply insufficient to "despoil a practice that on the whole reflects and embraces our tradition."  Id.

    Participation in the Board's opening ceremony, including the invocation, is voluntary.  Yet the district court concluded that Plaintiffs are subject to unconstitutional coercion because they claim to be compelled and coerced based on their subjective speculation about how their abstention might be received.  That conclusion cannot be reconciled with Town of Greece and its

53

rejection of the notion of coercion of adults in similar circumstances. Town of Greece identified a narrow range of exceptional circumstances that could render a legislative prayer practice coercive and outside the historical tradition of invocations that comport with the Establishment Clause. The Board's legislative prayer practice is not close to crossing that constitutional line.

IV.

None of the constitutional contentions raised by the Plaintiffs have validity under the facts of this case for the reasons set out above. Similarly, even taking all the Plaintiffs' claims as an amalgamated whole, they do not reflect a meritorious claim for the same reasons such claims failed in Marsh and Town of Greece.

The Board's legislative prayer practice falls within our recognized tradition and does not coerce participation by nonadherents. It is therefore constitutional. The district court erred in concluding to the contrary. Accordingly, the judgment of the district court is reversed and remanded with directions to dismiss the complaint.

REVERSED AND REMANDED
WITH DIRECTIONS

54

WILKINSON, Circuit Judge, dissenting:

*Welcome to the meeting of the Rowan County Board of Commissioners. As many of you are aware, we customarily begin these meetings with an invocation. Those who deliver the invocation may make reference to their own religious faith as you might refer to yours when offering a prayer. We wish to emphasize, however, that members of all religious faiths are welcome not only in these meetings, but in our community as well. The participation of all our citizens in the process of self-government will help our fine county best serve the good people who live here.*

—Message of Religious Welcome

The message actually delivered in this case was not one of welcome but of exclusion. That is a pity, because even a brief prefatory statement akin to that above might have helped to set a different tone for the meetings here while not requiring the judiciary to police the content of legislative prayer.

I.

Religious faith is not only a source of personal guidance, strength, and comfort. Its observance is also a treasured communal exercise which serves in times of need as the foundation for mutual support and charitable sustenance. But when a seat of government begins to resemble a house of worship, the values of religious observance are put at risk, and the danger of religious division rises accordingly. S.A. 1-10 (affidavits of Nancy Lund, Liesa Montag-Siegel, and Robert Voelker). This, I respectfully suggest, is what is happening here. It cannot be right. This case is more than a factual

55

wrinkle on Town of Greece v. Galloway, 134 S. Ct. 1811 (2014). It is a conceptual world apart.

Rowan County's prayer practice featured invocations week after week, month after month, year after year, with the same sectarian references. To be sure, Town of Greece ruled that sectarian prayer is not by itself unconstitutional. 134 S. Ct. at 1820-23. But the issue before us turns on more than just prayer content, the primary concern in Town of Greece. Whereas guest ministers led prayers in that case, it was public officials who exclusively delivered the invocations in Rowan County. Those prayers served to open a meeting of our most basic unit of government, a local board of commissioners that passes laws affecting citizens in the most daily aspects of their lives. The prayers, bordering at times on exhortation or proselytization, were uniformly sectarian, referencing one and only one faith though law by definition binds us all.

I have seen nothing like it. This combination of legislators as the sole prayer-givers, official invitation for audience participation, consistently sectarian prayers referencing but a single faith, and the intimacy of a local governmental setting exceeds even a broad reading of Town of Greece. That case in no way sought to dictate the outcome of every legislative prayer case. Nor did it suggest that "no constraints remain on [prayer] content." Id. at 1823. The

Establishment Clause still cannot play host to prayers that "over time . . . denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion." Id. To assess those risks, "[c]ourts remain free to review the pattern of prayers over time." Id. at 1826-27.

Above all, the Supreme Court stressed that "[t]he inquiry [into legislative prayer] remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed." Id. at 1825 (emphasis added). The parties have not cited any legislative prayer decision combining the particular speakers, audience involvement, prayer content, and local government setting presented here. Rowan County's counsel conceded during oral argument that this case is without precedent. Oral Argument at 9:20-10:08, Lund v. Rowan Cty. (No. 15-1591). I am left to wonder what limits, if any, to sectarian invocations at meetings of local government appellants would be prepared to recognize.

No one disputes that localities enjoy considerable latitude in opening their meetings with invocations and prayers. But the legislative prayer practice here pushes every envelope. I would not welcome this exceptional set of circumstances into the constitutional fold without considering its implications. A ruling for the County bears unfortunate consequences for American pluralism, for a nation whose very penny envisions one

57

out of many, a nation whose surpassing orthodoxy belongs in its constitutional respect for all beliefs and faiths, a nation which enshrined in the First and Fourteenth Amendments the conviction that diversity in all of its dimensions is our abiding strength.

## II.

Though the majority treats this case as all but resolved by Town of Greece, that decision did not touch upon the combination of factors presented here, particularly the question of legislator-led prayer. Indeed, prayers by public officials form a distinct minority within Establishment Clause case law. The great majority of legislative prayer cases have not involved legislators at all, but invocations by guest ministers or local religious leaders. E.g., Marsh v. Chambers, 463 U.S. 783, 784–85 (1983) (invocation by a chaplain paid by the state at the opening of state legislative sessions); Joyner v. Forsyth Cty., 653 F.3d 341, 343 (4th Cir. 2011) (prayers by leaders of local congregations at county commission meetings). The invocations in Town of Greece were likewise delivered solely by ministers from local congregations. 134 S. Ct. at 1816-17. Nearly all the congregations were Christian, and every minister selected during an eight-year period came from that faith. Id. But crucially, no public officials delivered prayers or influenced their content in any way. Id. As the district court noted, Town of Greece

58

"consistently discussed legislative prayer practices in terms of invited ministers, clergy, or volunteers providing the prayer, and not once described a situation in which the legislators themselves gave the invocation." Lund, 103 F. Supp. 3d at 722.

By contrast, the only eligible prayer-givers at Rowan County commission meetings were the five board commissioners, each of whom took up the responsibility in turn. Not only did they lead the prayers, but they also composed all the invocations "according to their personal faiths," which were uniformly Christian denominations. Id. at 724; J.A. 275-94 (affidavits of the five Rowan County commissioners). Compared to Town of Greece, the "much greater and more intimate government involvement" by the Rowan County board led the district court to find its prayer practice unconstitutional. Lund, 103 F. Supp. at 723.

Of course, the prayer practice was not infirm simply because it was led by the commissioners. As the majority and the states' amicus brief rightly remind, there exists a robust tradition of prayers delivered by legislators. According to a national survey and amici's own research, all but two state legislative bodies engage in legislative prayer or a moment of silence. Br. of Amici Curiae State of West Virginia and 12 Other States at 13. Lawmakers lead at least some legislative prayers in just over half of those states, including seven of the ten

59

state legislative chambers within our circuit. Id. at 13-14. Many county and city governments also call upon elected officials to give prayer. Id. at 15.

The tradition of prayer by legislators is but one indicator of how unrealistic it would be to divorce democratic life from religious practice. We see their intertwined nature whenever candidates for all levels of political office proclaim their faith on the campaign trail. Voters may understandably wish to factor the religious devotion of those they elect into their political assessments. It could not be otherwise. As Justice William O. Douglas aptly observed, "We are a religious people whose institutions presuppose a Supreme Being." Zorach v. Clauson, 343 U.S. 306, 313 (1952).

The Supreme Court thus recognized that "a moment of prayer or quiet reflection sets the mind[s] [of legislators] to a higher purpose and thereby eases the task of governing." Town of Greece, 134 S. Ct. at 1825. The solemnizing effect for lawmakers is likely heightened when they personally utter the prayer. In deference to that purpose, I would not for a moment cast all legislator-led prayer as constitutionally suspect. As the Supreme Court has emphasized, "[L]egislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." Id. at 1818.

Prayers delivered by legislators, however, are themselves quite diverse. We cannot discern from the general survey proffered by amici which prayers were primarily for the benefit of legislators or commissioners as in Town of Greece and which focused, as the prayers did here, on requesting the citizens at the meeting to pray. Nor do we know from the survey what percentage of prayers given by elected officials generally contain sectarian references or proselytizing exhortations, or which are non-denominational or delivered by legislators of diverse faiths. And in fact, the very survey on which the majority and amici rely takes care to note that highly sectarian prayers represent "not only a breach of etiquette," but also an "insensitivity to the faith of others." National Conference of State Legislatures, Inside the Legislative Process 5-145 (2002) [hereinafter NCSL Survey]; see Maj. Op. at 24; Br. of Amici Curiae State of West Virginia and 12 Other States at 13. Further, the survey cautions, the prayer-giver "should be especially sensitive to expressions that may be unsuitable to members of some faiths." NCSL Survey at 5-146.

We should focus then not on any general survey but on the interaction among elements specific to this case -- legislative prayer-givers exclusively of one faith, legislative invitation to the citizens before them to participate, and exclusively sectarian prayers referencing a single faith in every regular

meeting of a local governing body over a period of many years. At a certain point, the interaction of these elements rises to the level of coercion that Town of Greece condemned. Id. at 1823.

## III.

## A.

I shall discuss each of the aforementioned elements in turn, beginning with the fact that the commissioners themselves delivered the invocations. Legislator-led prayer, when combined with the other elements, poses a danger not present when ministers lead prayers. The Rowan County commissioners, when assembled in their regular public meetings, are the very embodiment of the state. From November 2007, when the county began recording its board meetings, to the start of this lawsuit in March 2013, 139 out of 143 meetings, or 97%, began with legislators delivering prayers explicitly referencing Christianity. Lund, 103 F. Supp. 3d at 714; see also Lee v. Weisman, 505 U.S. 577, 588 (1992) (defining sectarian prayer as "us[ing] ideas or images identified with a particular religion"). The vast majority of those 139 prayers closed with some variant of "in Jesus' name." S.A. 12-38 (transcript of all Rowan County prayers on record). Only four invocations, given by the same now-retired commissioner, were non-sectarian, J.A. 296 & n.2, and no prayer mentioned a religion other than

62

Christianity in five-and-a-half years, Lund, 103 F. Supp. 3d at 714.

The five commissioners, all Christian, "maintain[ed] exclusive and complete control over the content of the prayers." Lund, 103 F. Supp. 3d at 733. At times, the prayers seemed to blend into their legislative role. As one commissioner put it, "Lord, we represent you and we represent the taxpayers of Rowan County." S.A. 16. When the state's representatives so emphatically evoke a single religion in nearly every prayer over a period of many years, that faith comes to be perceived as the one true faith, not merely of individual prayer-givers, but of government itself. The board's rules and regulations bind residents of all faiths, Christian, Hindu, Jewish, Muslim, and many other believers and non-believers as well. And yet those laws that govern members of every faith are passed in meetings where government overtly embraces only one. That singular embrace runs up against "[t]he clearest command of the Establishment Clause," that "one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244 (1982).

An equally clear command is that "each separate government in this country should stay out of the business of writing or sanctioning official prayers." Engel v. Vitale, 370 U.S. 421, 435 (1962). Town of Greece echoed that principle even as it

63

upheld legislative prayer: "Our Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior." 134 S. Ct. at 1822. These age-old warnings have apparently fallen on deaf ears here. By instituting its elected officials as the sole proclaimers of the sole faith, Rowan County is elbow-deep in the activities banned by the Establishment Clause -- selecting and prescribing sectarian prayers. Although the county contends that the prayer practice reflects only the desire of individual members of the board, Appellant's Reply Br. at 8-9, it is hard to believe that a practice observed so uniformly over so many years was not by any practical yardstick reflective of board policy.

Further, the prayer-giver's identity affects the range of religions represented in legislative prayer. Because only commissioners could give the invocation, potential prayer-givers in Rowan County came from a "closed-universe" dependent solely on electoral outcomes. Lund, 103 F. Supp. 3d at 723. Appellant frames this as a benefit. The election process, it says, which welcomes candidates of all faiths or no faith, holds greater promise of diversity than the selection of ministers by government officials, which, the county points out, resulted in the same chaplain for sixteen years in the case of Marsh v. Chambers. Appellant's Br. at 26.

64

But the county is comparing apples and oranges. While a small group of legislators can diversify their appointment of prayer-givers at will, it may be more difficult to expect voters to elect representatives of minority religious faiths. For instance, after residents in the town of Greece complained about the pervasive Christian prayers, local officials granted a Jewish layman, a Baha'i practitioner, and a Wiccan priestess the opportunity to lead prayers. Town of Greece, 134 S. Ct. at 1817. The Court took comfort in the fact that "any member of the public is welcome in turn to offer an invocation reflecting his or her own convictions." Id. at 1826. But no guest ministers or clergy and no member of the public delivered an invocation here, that being reserved for the commissioners belonging to the faith that dominates the electorate.

Entrenching this single faith reality takes us one step closer to a de facto religious litmus test for public office. When delivering the same sectarian prayers becomes embedded legislative custom, voters may wonder what kind of prayer a candidate of a minority religious persuasion would select if elected. Failure to pray in the name of the prevailing faith risks becoming a campaign issue or a tacit political debit, which in turn deters those of minority faiths from seeking office. It should not be so.

65

None of this is to imply a need for "religious balancing" among candidates, elected officials, or legislative prayers. Id. at 1824. Without going so far, we still must contend with the far-reaching implications of an unremitting record--overwhelmingly sectarian prayers led solely by legislators through many meetings over many years. No single aspect or consequence of this case alone creates an Establishment Clause problem. Rather, it is the combination of the role of the commissioners, their instructions to the audience, their invocation of a single faith, and the local governmental setting that threatens to blur the line between church and state to a degree unimaginable in Town of Greece.

## B.

That brings us to the second problematic element in this case: the fact that the prayers of the commissioners were preceded by a request or encouragement for audience participation. Town of Greece reminds us to look to the effect of legislative prayer on the audience, not merely the actions of the prayer-givers. See 134 S. Ct. at 1825-26. Here the effect is apparent. The attendees at Rowan County board meetings, upon hearing the invocations uttered by the state's representatives day in and day out, must have grasped the obvious: the Rowan County commission favors one faith and one faith only. In the eyes and ears of the attendees, that approval sets the tone for

66

the meetings to follow. As expressed by one plaintiff in this case, "[T]he prayers sent a message that the County and Board favors Christians and that non-Christians, like [her], are outsiders." S.A. 5 (affidavit of Liesa Montag-Siegel).

This message was amplified by frequent exhortations. Commissioners spoke directly to the attendees during prayer, asking them to stand and leading with phrases like "Let us pray" or "Please pray with me." Lund, 103 F. Supp. 3d at 714, 727. The record reflects that the great majority of attendees did in fact "join the Board in standing and bowing their heads," id. at 714, and that plaintiffs themselves "[a]s a result of the [Board] Chair's instructions" felt "compelled to stand" so that they would not stand out, S.A. 1-10 (plaintiffs' affidavits). When reviewing phrases like "Let us pray" or "Please pray with me," Town of Greece underscored that the requests "came not from town leaders but from the guest ministers." 134 S. Ct. at 1826. The Court noted that its "analysis would be different if town board members directed the public to participate in the prayers." Id. (emphasis added). Here they did. "[T]he Board's statements," the district court noted, "fall squarely within the realm of soliciting, asking, requesting, or directing . . . of concern to the Town of Greece plurality." Lund, 103 F. Supp. 3d at 728.

A request to an audience to stand or pray carries special weight when conveyed in an official capacity by an elected

67

commissioner facing his constituents, with his board arrayed behind or beside him, directly before discharging his official duties. Id. County board decisions affect both property and livelihood, including zoning laws and variances, school funding, police protection, fire prevention and sanitation budgets, and the location of parks and other areas of recreation. Br. of Amici Curiae Religious Liberty Orgs. at 25. I do not at all suggest that commissioners would base their decisions on who prays and who doesn't. I do note, however, that the close proximity of participatory sectarian exercises to citizen petitions for the many benefits that local boards can withhold or dispense presents, to say the least, the opportunity for abuse.

## C.

Nothing about the constitutional drawbacks of Rowan County's prayer practice should be construed as disparaging the prayers themselves, which were moving and beautiful on many levels. Each invocation was luminous in the language that many millions of Americans have used over many generations to proclaim the Christian faith. The constitutional challenge directed at the invocations is in no sense a commentary on the worth and value of prayer or on the devotion of the citizens of Rowan County and their elected officials to their faith.

68

The prayers here, which would be so welcome in many a setting, cannot be divorced from the proceedings in which they were spoken. It is not the prayers but the context that invites constitutional scrutiny. Establishment Clause questions are by their nature "matter[s] of degree," which indicates some acceptable practices and others that cross the line. Van Orden v. Perry, 545 U.S. 677, 704 (2005) (Breyer, J., concurring in judgment). For the average citizen of Rowan County, these meetings might well have been the closest interaction he or she would have with government at any level. To reserve that setting for an embrace of one and only one faith over a period of years goes too far.

This is especially so where prayers have on occasion veered from invocation to proselytization. Even with the greater latitude afforded in Town of Greece, legislative prayer still cannot be "exploited to proselytize or advance any one . . . faith or belief." 134 S. Ct. at 1823 (quoting Marsh, 463 U.S. at 794-95). Plaintiffs, all non-Christians, cited examples that they found overtly sectarian or proselytizing:

- "As we get ready to celebrate the Christmas season, we'd like to thank you for the Virgin Birth, we'd like to thank you for the Cross at Calvary, and we'd like to thank you for the resurrection. Because we do believe that there is only one way to salvation, and that is Jesus Christ." J.A. 16 (prayer of December 3, 2007).

- "Our Heavenly Father, we will never, ever forget that we are not alive unless your life is in us. We are the

69

recipients of your immeasurable grace. We can't be defeated, we can't be destroyed, and we won't be denied, because of our salvation through the Lord Jesus Christ. I ask you to be with us as we conduct the business of Rowan County this evening, and continue to bless everyone in this room, our families, our friends, and our homes. I ask all these things in the name of Jesus, Amen." Id. (prayer of May 18, 2009).

- "Let us pray. Holy Spirit, open our hearts to Christ's teachings, and enable us to spread His message amongst the people we know and love through the applying of the sacred words in our everyday lives. In Jesus' name I pray. Amen." Id. at 17 (prayer of March 7, 2011).

- "Let us pray. Merciful God, although you made all people in your image, we confess that we live with deep division. Although you sent Jesus to be Savior of the world, we confess that we treat Him as our own personal God. Although you are one, and the body of Christ is one, we fail to display that unity in our worship, our mission, and our fellowship. Forgive our pride and arrogance, heal our souls, and renew our vision. For the sake of your Son, our Savior, the Lord Jesus Christ, Amen." Id. (prayer of October 3, 2011).

The point here is not to pick apart these prayers or to measure objectively their proselytizing content. It is to consider how this language might fall on the ears of Hindu attendees, Jewish attendees, Muslim attendees, or others who do not share the commissioners' particular view of salvation or their religious beliefs. It is not right to think that adherents of minority faiths are "hypersensitive." Maj. Op. at 33. If we Christians were a religious minority, we would surely be sensitive to the invariable commencement of town hall meetings through invocation of a faith to which we did not subscribe. And if religious faith was not a matter of sensitivity, then why

70

would two of our Constitution's best known and most prominent provisions have been devoted to it?

The invocations here can sound like an invitation to take up the tenets of Christian doctrine. And an invitation can take on tones of exhortation when issued from the lips of county leaders. Although those attending the board meeting may have "had several options available -- they could arrive after the invocation, leave for the duration of the prayer, or remain for the prayer without participating," maj. op. at 47, such options served only to marginalize.

Indeed, to speak of options masks important differences. People often go to church or join groups and organizations out of a sense of choice. It is the faith they have chosen or it is a group to which they wish to belong. But people often go to local government meetings in their capacity as citizens in order to assert their views or defend their rights vis-à-vis an entity with legal and coercive powers. These are two very different forms of attendance. In board meetings, it fell to non-Christian attendees, facing their elected representatives and surrounded by bowed heads, to choose "between staying seated and unobservant, or acquiescing to the prayer practice." Lund, 103 F. Supp. 3d at 732. It is no trivial choice, involving, as it does, the pressures of civic life and the intimate precincts of the spirit.

71

The Rowan County board can solemnize its meetings without creating such tensions. The desire of this fine county for prayer at the opening of its public sessions can be realized in many ways, such as non-denominational prayers or diverse prayer-givers. Another possibility, open to legislators of any faith, might be the Message of Religious Welcome described above. Such an expression of religious freedom and inclusion would promote the core idea behind legislative prayer, "that people of many faiths may be united in a community of tolerance and devotion." Town of Greece, 134 S. Ct. at 1823. A Message of Religious Welcome separate from the invocation itself also reduces the risk that courts will "act as supervisors and censors" of prayer language, a major concern voiced by the Supreme Court. Id. at 1822. Indeed, the availability of so many inclusive alternatives throws into relief the unfortunate confluence of factors in the county's practice. For the county to insist on uniformly sectarian prayer led by legislators of one faith in a closed and purely governmental space carries us far from the central premise of the Establishment Clause.

IV.

By pairing the Free Exercise Clause with the Establishment Clause in the First Amendment, the Framers struck a careful balance. Americans are encouraged to practice and celebrate their faith but not to establish it through the state. See

72

Engel, 370 U.S. at 429-34 (discussing the historic roots of the Establishment Clause as it relates to the Free Exercise Clause). This seems an inapt moment to upset that ancient balance. The violent sectarian tensions in the Middle East are only the most visible religious divisions now roiling the globe. Are such levels of hostility likely here? Probably not, but it behooves us not to take our relative religious peace for granted and to recognize that the balance struck by our two great religion clauses just may have played a part in it. In venues large and small, a message of religious welcome becomes our nation's great weapon, never to be sheathed in this or any other global struggle. Believing that legislative prayer in Rowan County can further both religious exercise and religious tolerance, I respectfully dissent.